UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CASE NO. 3:00CR203(EBB) |
| JOHN A. HACKNEY | : January 3, 2005 |

GOVERNMENT'S REVISED MEMORANDUM IN SUPPORT
OF MOTION FOR DOWNWARD DEPARTURE

Pursuant to U.S.S.G. §5K1.1, the Government moves this Court for a departure downward from the defendant's applicable guideline range in light of his substantial assistance to the Government in the investigation and prosecution of other individuals. The bases for that motion are set forth below.

Background

On September 22, 2000, the defendant, John A. Hackney, pleaded guilty to a one count Information filed in the District of Connecticut charging him with RICO Conspiracy (18 U.S.C. §1962(d). Further, the defendant pleaded guilty to a one count Information filed in the Middle District of Tennessee which charged the defendant with Money laundering (18 U.S.C. §1956(a)(2)) and which was transferred to the District of Connecticut under the provision of Rule 20, Fed.R.Crim.P.

His pleas stem from his almost nine year involvement with Martin Frankel, the leader of a Racketeering Enterprise through which hundreds of millions of dollars were laundered and over $200 million stolen. Frankel, with the assistance of the defendant and numerous others, acquired anonymous control over

various insurance companies and their assets. He also had anonymous control over the brokerage house, LNS, Inc., at which the insurance company assets were ostensibly invested. Frankel's relevant criminal conduct began in 1989 with the theft of Creative Partners investment funds, which was covered up with assets taken from the first insurance company purchased. Thus began one of the most destructive and complex "ponzi" schemes ever to hit the United States insurance industry. The defendant Hackney became involved in this complex scheme in approximately 1990.

Over the course of eight years, Frankel, with the knowing assistance of the defendant and others, looted the monies of various insurance companies, before fleeing the country upon the eve of discovery. Each insurance company over which Frankel exercised control through the defendant Hackney and the Thunor Trust has been placed in receivership.

## Discussion

Section §5K1.1 of the Sentencing Guidelines states:

Upon motion of the Government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

(a)  The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

   (1)  the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the Government's evaluation of the assistance rendered;

      (2)    the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

      (3)    the nature and extent of the defendant's assistance;

      (4)    any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

      (5)    the timeliness of the defendant's assistance.

The decision whether to make a motion for downward departure rests exclusively with the Government. 18 U.S.C. §3553(e); U.S.S.G. §5K1.1; Wade v. United States, 504 U.S. 181 (1992); Melendez v. United States, 518 U.S. 120 (1996); United States v. Difeaux, 163 F.3d 725 (2d Cir. 1998); United States v. Avellino, 136 F.3d 249 (2d cir. 1998); United States v. Huerta, 878 F.2d 89, 93 (3d Cir. 1989). The Court in Huerta observed that the question of "substantial assistance" is "self evidently a question that the prosecution is uniquely fit to resolve." Huerta, 878 F.2d at 92. Upon the filing by the Government of a §5K1.1 motion, "the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect on defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C. §3553(e).

Application Note 3 to the commentary of U.S.S.G. §5K1.1 provides that "substantial weight should be given to the Government's evaluation of the extent of defendant's assistance." Id.; see also United States v. Rexach, 896 F.2d 710, 714 (2d Cir. 1990). In this memorandum, the Government will evaluate the

defendant's assistance using the factors set forth in U.S.S.G. §5K1.1 in order that the Court may determine the appropriate reduction in the defendant's sentence.

**A.   The significance and usefulness of the cooperation and the truthfulness, completeness, and reliability of the information or testimony provided by the defendant**

The first factor is "the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the Government's evaluation of the assistance rendered."  U.S.S.G. § 5K1.1(a)(1).  The second is the truthfulness and reliability of the information.  As these are inextricably interwoven in the context of this case, they are discussed together.

The defendant Hackney was one of the most significant players in the mammoth fraud perpetrated by Frankel in that Hackney participated in the scheme over a prolonged period of time and was an integral part of the bogus front (that is, the Thunor Trust) used by Frankel to continue his operations.  At the same time, as set forth hereinafter, the defendant also cooperated completely and in a timely manner.  His assistance to investigators was of extraordinary value, and his candor was remarkable.  Indeed, the defendant was debriefed on may occasions, he testified at the trial of Mona Kim, and at no time did he attempt to back pedal, obfuscate or minimize his own criminal conduct.  The value of his assistance can be described best by a review of his direct involvement in Frankel's criminal

scheme.

Beginning in approximately 1990, the defendant began his association with and employment by Martin R. Frankel. The defendant understood that Frankel was looking to invest in the banking industry through the purchase of a bank in the Southeastern United States. Several attempts to locate appropriate financial institutions for acquisition were made by the defendant, working with others, at Frankel's direction. During the course of these efforts, Frankel made clear to the defendant and the defendant understood that Frankel's involvement in the investment would remain anonymous. That is, Frankel's name would not be associated with the acquisition of a financial institution despite the fact that he would be providing the funds for the acquisition and would be overseeing the running of the acquired institution.

In approximately 1991, the defendant, on Frankel's behalf, began investigating the purchase of insurance companies as an alternative to purchasing a banking institution. The defendant, again acting with others, identified Franklin American Corporation, a publically traded corporation which wholly owned Franklin American Life Insurance Company (FALIC), as available for acquisition. Frankel decided to acquire FAC and its subsidiary FALIC.

Frankel decided and the defendant and others agreed that Frankel's involvement in this acquisition would remain anonymous. Therefore, the defendant, Frankel and others, determined to

5

establish a Tennessee trust, the sole Trustee of which would be the defendant. The Trust was named "The Thunor Trust." In order to form the Thunor Trust, Frankel provided the names of three individuals who were listed as "grantors" of the trust and who were identified as the individuals who provided the funds for the formation of the trust and the purchase of FAC. The defendant knew that these individuals were in fact nominee grantors for Frankel and that the funds used to fund the trust and purchase FAC were provided by Frankel.

In connection with the formation of the Thunor Trust and the acquisition of FAC, the defendant and others created false and fictitious records which were filed with the Tennessee Department of Insurance and Commerce, the Securities and Exchange Commission and other state and federal regulatory agencies. These records concealed Frankel's role in the formation of the Thunor Trust and his actual control of the Trust.

Following the acquisition of FAC, the defendant assumed the position of President and CEO of FALIC. In the course of his employment, the defendant continued to conceal Frankel's anonymous control of the Thunor Trust, FAC and FALIC. In addition, upon acquisition of FALIC, the defendant, at Frankel's direction, caused the reserve assets of FALIC (approximately $18,000,000) to be liquidated and transferred to accounts under Frankel's control. Frankel stated that the funds would be invested in U.S. government and other similar securities. These transfers were accomplished through wire transfer.

The accounts under Frankel's control were held under the name of a brokerage firm called Liberty National Securities, Inc. (LNS, Inc.)  The defendant understood that Frankel controlled LNS, Inc. through aliases and nominees.  However, the defendant also knew that Frankel was, at first, the subject of an SEC investigation and he learned ultimately that Frankel had been barred by the SEC from trading securities and from association with any broker dealer, investment adviser or securities dealer. He knowingly concealed this fact from state and federal regulatory agencies and others.  As with his control of the Thunor Trust, the defendant, Frankel and the others involved with the operation of the insurance companies and transfer of the funds, deliberately kept Frankel's control of LNS, Inc. anonymous.  The defendant represented to FALIC, FAC, regulatory agencies and others that the individual with whom he dealt at LNS, Inc. was an individual by the name of Eric Stevens.  As the defendant knew, "Eric Stevens" was an alias utilized by Frankel.

Following the initial acquisition of FALIC, the defendant and others assisted in the identification and acquisition of additional insurance companies.  Each insurance company acquired was purchased with funds provided by Frankel.  However, in each instance, the defendant maintained Frankel's anonymity and portrayed the nominee grantors of the Thunor Trust as the individuals providing the funding for the purchase.  With respect to each acquisition, the defendant misrepresented to regulatory agencies and others that he was acting as the controlling

principal of the Trust as the sole Trustee when he then well knew that it was Frankel who was in fact the controlling principal. Finally, after each acquisition, the cash reserves of each acquired company were sent to accounts under Frankel's control at LNS, Inc., for, as Frankel had indicated, investment in U.S. government and other securities.

The acquisitions were as follows:

- In February 1994, the defendant, Frankel and others caused FAC to acquire Family Guaranty Life Insurance Company ("FGLIC"), a provider of insurance services domiciled in the State of Mississippi.

- In March 1994, the defendant, Frankel and others caused FALIC to acquire control of Farmers and Ranchers Life Insurance Company ("F&RLIC"), an Oklahoma insurance provider which they subsequently had International Financial Corporation ("IFC") acquire in or around October 1994. IFC was a wholly owned entity of the Thunor Trust, incorporated in the State of Oklahoma with its principal place of business in Tennessee. IFC similar to FAC, was a holding company for insurance providers.

- In August 1994, the defendant, Frankel and others caused FAC to acquire International Financial Services Life Insurance Company ("IFSLIC"), an insurance provider domiciled in the State of Missouri. IFSLIC was subsequently acquired by IFC.

- In March 1995, the defendant, Frankel and others caused FAC to acquire Franklin Protective Life Insurance Company ("FPLIC"), a provider of insurance services domiciled in the State of

8

Mississippi.

- In December 1997, the defendant, Frankel and others caused IFC to acquire First National Life Insurance Company of America ("FNLIC"), an insurance provider domiciled in the State of Mississippi.

- In April 1999, the defendant, Frankel and others caused FALIC to acquire Old South West Life Insurance Company ("OSWLIC"), an insurance provider domiciled in the State of Arkansas.

From time to time, the defendant, Frankel and others also caused the Thunor Trust and the insurance providers owned by the Thunor Trust to enter into re-insurance and other agreements. These agreements resulted in an increase in the cash reserves available to the Thunor Trust insurance companies and thus under the control of Frankel operating under the name Eric Stevens as LNS, Inc.

For example, on approximately October 30, 1998, FNLIC entered into a re-insurance agreement with Peoples Benefit Life Insurance Company ("Peoples") and Veterans Life Insurance Company ("Veterans"). In connection with this agreement, from between November 6, 1998, and February 25, 1999, Peoples and Veterans transferred approximately $15,000,000 to FNLIC, which funds represented the cash reserves associated with the policies covered by the re-insurance agreement. Thereafter, the defendant, at Frankel's direction, caused these funds to be

9

transferred to Frankel, who utilized the alias of Eric Stevens to operate LNS Inc., where they were to be held for the benefit of FNLIC.

Similarly, on approximately April 1, 1999, FNLIC entered into a re-insurance agreement with Settlers Life Insurance Company of Virginia ("Settlers") for the assumption and reinsurance of numerous Settlers life insurance policies.  In connection with this agreement, the asset reserves maintained in connection with those policies, approximately $44 million, were transferred by Settlers to FNLIC.  Thereafter, the defendant, at Frankel's direction caused these reserves to be transferred to Frankel acting as LNS, Inc., to be held for the benefit of FNLIC.

From the time of the acquisition of FAC and FALIC in 1991 through April 1999, the defendant, through a series of misrepresentations continued to conceal Frankel's control of the Thunor Trust, FAC, IFC and their affiliates.  Through a series of misrepresentations, he also maintained Frankel's anonymity as the controller of LNS, Inc.  In order to, among other things, conceal the fact that the grantors were mere nominees for Frankel, the defendant falsely represented to various individuals, employees of FAC and regulatory agencies that he had personally met with the grantors of the Thunor Trust.  The defendant, with regularity and frequency also falsely represented to various individuals and regulatory agencies that the investment decisions made with respect to the cash reserves of the insurance companies were made

by himself, when in fact, he knew that Frankel had ultimate control over the funds and that he, the defendant, had little input into or knowledge regarding the actual disposition or investment of the cash reserves.

In mid-1998, Frankel determined to expand his control of insurance companies.  In connection with that plan, he formed the St. Francis of Assisi Foundation.  However, once again, Frankel's involvement in, and control over, the SFAF was anonymous to all but his co-conspirators. The defendant knew that Frankel controlled the SFAF and concealed this fact from state regulatory authorities and others.  The defendant, on Frankel's behalf, began working on the possible acquisition of additional insurance companies.  In so doing, the defendant misrepresented both the source of the SFAF's funds and its controlling parties. As with the companies already under Frankel's control, Hackney understood that the cash reserves of the insurance companies to be acquired under the SFAF umbrella would be sent to Frankel acting as LNS, Inc.  Despite the defendant's efforts, no such acquisitions came to fruition.

In addition to his compensation received for work done as the President of the various insurance companies, in exchange for his efforts on Frankel's behalf, the defendant received significant financial benefit.  The majority of these benefits were sent via wire transfer from Frankel's bank account at Banque SCS Alliance in Geneva, Switzerland to an account in the name of

11

the Thunor Trust. The defendant had signing authority on the Thunor Trust account. Frankel funded the account as a means and mechanism for compensating the defendant for his role in furthering the illegal scheme as well as for his efforts on behalf of the companies.

For example, Hackney received $515,000.00 for the purchase of his home at 211 3rd Avenue, Franklin, Tennessee. The funds utilized in the purchase of Hackney's residence were transferred from Frankel's overseas account which he maintained at Banque SCS Alliance in Switzerland to an account at the Southtrust Bank of Middle Tennessee in Nashville, Tennessee. The property was titled in the name of Middleburg investments, an off-shore corporation set up by Frankel and used by Hackney to conceal or disguise the true ownership of the property. He also received $375,630.28 for the purchase of a second home in Guntersville, Alabama. Among other benefits, the defendant also received financial benefit from Frankel in either cash or by way of having personal expenses paid for by the Thunor Trust in the following approximate amounts:

    1992:  $  174,900.00
    1993:  $   18,988.00
    1994:  $  390,100.00
    1995:  $  243,900.00
    1996:  $  742,200.00
    1997:  $1,316,300.00

```
1998:  $3,223,200.00
1999:  $  922,700.00
```

### B.    The nature and extent of the defendant's assistance

The third factor is "the nature and extent of the defendant's assistance." U.S.S.G. § 5K1.1(a)(3). As noted above, the defendant was debriefed on many occasions by federal and state investigators. Further, he was called upon to testify in the matter of United States v. Mona Kim, the only individual charged in the Frankel-related crimes who elected to go to trial. In the Government's view, the defendant was a truthful, credible and valuable witness at that trial. His assistance was also of significant value in the investigation and prosecution of numerous others who were ultimately convicted in the Frankel-related cases. Indeed, the Government is very confident that his cooperation played a role in the decisions of numerous others to enter guilty pleas in this case.

Finally, the defendant agreed to the forfeiture of two houses which were purchased with funds provided by Martin Frankel. The agreed upon forfeitures saved the Government and victims both time and expenses in their attempts to recover looted assets of the insurance companies. It should be noted that the return of stolen funds or restitution in advance of sentencing is <u>not</u> ordinarily a basis upon which the Government relies when it files a 5K1.1 Motion. This conduct is, however, included in the Government's submission because of the time,

effort and additional losses that would have been incurred had the forfeitures been the subject of litigation.

    **C.    Any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance**

The fourth factor is "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance." U.S.S.G. § 5K1.1(a)(4). With respect to the cooperation with the undersigned, the Government is not aware of any identifiable risk or danger to the defendant as a result of his cooperation.

    **D.    The timeliness of the defendant's assistance.**

The final factor is "the timeliness of the defendant's assistance." U.S.S.G. § 5K1.1(a)(5). The defendant's cooperation was timely.

## Conclusion

In conclusion, the Government believes that the defendant has provided substantial assistance in the investigation and prosecution of other individuals. It is therefore respectfully

requested that the Court grant the defendant a departure from the defendant's applicable guideline range pursuant to U.S.S.G. §5K1.1.

> Respectfully submitted,
>
> KEVIN J. O'CONNOR
> UNITED STATES ATTORNEY
>
> JOHN H. DURHAM
> DEPUTY UNITED STATES ATTORNEYS
> 157 CHURCH STREET, 23RD FLOOR
> NEW HAVEN, CONNECTICUT 06510
> (203)821-3700
> FED BAR NO. ct05087

CERTIFICATION OF SERVICE

This is to certify that the within and foregoing has been provided this 3rd day of January, 2005 by facsimilie and regular mail to:

>Curtis L. Bowe, III
>c/o Law Offices of Peter C. Ensign
>6925 Shallowford Road, Suite 301
>Chattanooga, Tennessee 37421

>Warren Maxwell
>United States Probation Officer
>157 Church Street, 22nd Floor
>New Haven, Connecticut 06510
>Facsimile: 203-773-2100

                                   _____
                                   John H. Durham
                                   DEPUTY UNITED STATES ATTORNEY